MUNSTER MED INN, Appellant–
Defendant,

v.

Sheila BANKS, Appellee–Plaintiff.

No. 93A02–0903–EX–200.

Court of Appeals of Indiana.

Sept. 28, 2009.

Kathryn A. Moll, Nation Schoening Moll, Fortville, IN, Attorney for Appellant.

Sandra O'Brien, Mindel & Associates, Merrillville, IN, Attorney for Appellee.

## OPINION

MAY, Judge.

Munster Med Inn ("Munster") appeals the determination of the Worker's Compensation Board that the Second Injury Fund is not responsible for a portion of Sheila Banks' disability benefits. Banks cross-appeals, requesting that we increase her award. We reverse and remand, but deny the cross appeal.

## FACTS AND PROCEDURAL HISTORY

Munster, a long-term care facility, employed Banks as a licensed practical nurse. Banks has had diabetes for several years and has vision problems related to that condition. As of March 31, 2005, Banks had visual acuity of 20/50 in her right eye and 20/200 in her left eye. On May 5,

2006, Banks fell off a chair at work and hit her head. This injury further damaged Banks' vision.

On September 14, 2006, Banks was evaluated by Dr. Barry J. Kaufman, an ophthalmologist. He reported Banks was "barely able to see the 20/400 level" with her left eye. (Appellant's App. at 39.) Banks' visual acuity in her right eye was 20/100 without correction and "[p]otential acuity meter testing in the right eye was 20/200." (*Id.*) His report further states:

At this juncture, it appears that Ms[.] Bank's [sic] decreased visual acuity is secondary to retinal ischemia and chronic macular edema, all secondary to diabetic disease and recurrent vitreous hemorrhage[.] Due to the fact that this is caused by damage to nerve tissue, there does not appear to be any further treatment that would be helpful to improve visual acuity[.] I have recommended that Ms[.] Banks have a low visual evaluation as this may help her to improve her lifestyle with the visual acuity that she has remaining.... The patient is legally blind, as legal blindness is defined as visual acuity of 20/200 or less in the better eye ... At this point, she can be classified as ... legally blind, and we will await the results of the low vision evaluation to see what her functionality will be with any recommended optical devices[.]

(*Id.* at 41.)

On September 29, 2006, Dr. Kaufman clarified his determination Banks was legally blind:

1. The visual acuity could be 20/200 or even worse in a variety of testing situations. In a hallway testing situation without illumination, on the largest Snellen chart,[1] she was 20/100. However,

---

1. Munster offers the following explanation of the Snellen Test in its brief:

In the Snellen Test, a patient is placed twenty feet away from a chart upon which

potential acuity meter testing in the right eye was only 20/200 with some difficulty.

2. In addition to the visual acuity of 20/100, I did fail to mention that Humphrey visual field 30 $^{-2}$ testing performed on September 06, 2006 revealed marked constriction of the patient's visual field secondary to diabetes and glaucoma, with barely a central island of 10 degrees of vision remaining. Certainly, this combined with the visual acuity of 20/100, can classify her as legally blind in the right eye, and affords her marked visual disability.

(*Id.* at 43.)

Banks filed applications for adjustment of claim naming Munster and the Second Injury Fund as defendants.[2] On June 12, 2008, a hearing was held before a single hearing member. The parties stipulated to details of Banks' injury and to the admission of her medical records. Patty Shimala, Munster's assistant administrator, was the only witness to testify. Shimala testified Banks had to read hospital records, treatment orders, and medication orders. Before the accident, Shimala noticed Banks was having difficulty reading; she would have to hold documents very close to her face. Although Shimala was somewhat concerned about Banks' ability to read, Banks was able to properly dispense medications. Banks never returned to work after the accident.

The single hearing member determined Banks had a permanent total disability resulting from her May 5, 2006 work acci-

dent. The single hearing member made the following award:

1. Defendant is responsible for payment of permanent partial impairment benefits to Plaintiff based upon a permanent partial impairment rating of 28.7% as a result of the accident of May 5, 2006.

2. Defendant is responsible for payment of permanent total disability benefits to Plaintiff subject to any offset which may be appropriate for payments already made.

3. Plaintiff's attorney is awarded attorney fees pursuant to Ind.Code § 22–3–1–4(d).

(*Id.* at 52.) The single hearing member determined Munster alone, and not the Second Injury Fund, was responsible for payment of Banks' benefits. Munster applied for review by the full Worker's Compensation Board. The Board adopted the order of the single hearing member except for the paragraph awarding permanent partial impairment benefits.

## DISCUSSION AND DECISION

### 1. *Munster's Appeal*

■ Munster argues the Second Injury Fund is responsible for a portion of Banks' benefits pursuant to Ind.Code § 22–3–3–13(b), which provides:

If an employee who from any cause, had lost, or lost the use of, one (1) hand, one (1) arm, one (1) foot, one (1) leg, or one (1) eye, and in a subsequent industrial accident becomes permanently and totally disabled by reason of the loss, or loss

---

appears different size letters. A [person with normal vision] can read from that position the letter on the line marked "20"; hence, there is 20/20 vision. If he cannot read that line, but can read another line of letters, larger than the ones in "20," his vision is determined by whatever the number is on the line which he can read.

*Ben F. Small, Worker's Compensation of Indiana,* § 8.28, p. 201 (1950). (Appellant's Br. at 7–8.)

2. Although the Second Injury Fund was made a defendant, there is no indication in the record that it has participated in this case.

of use of, another such member or eye, the employer shall be liable only for the compensation payable for such second injury. However, in addition to such compensation and after the completion of the payment therefor, the employee shall be paid the remainder of the compensation that would be due for such total permanent disability out of a special fund known as the second injury fund, and created in the manner described in subsection (c).

Only one reported decision has interpreted this provision: *Linville v. Hoosier Trim Products,* 664 N.E.2d 1178 (Ind.Ct. App.1996), *trans. denied.* In 1982, Linville suffered a work-related injury that resulted in an eleven percent permanent partial impairment of her right hand. In 1988, Linville suffered a second work-related injury, sustaining a thirty-seven percent permanent partial impairment of her left hand. We concluded the Second Injury Fund was not responsible for paying any portion of Linville's benefits:

> When analyzed within the context of I.C. 22–3–3–13(a) [now (b)], the word "lost" connotes total deprivation of a body part, or the total deprivation of the use of a body part. The word "lost" simply does not suggest the mere diminution of the use of a body part. Our interpretation is supported by the legislature's list of scheduled injuries and corresponding compensation rates found at Ind.Code 22–3–3–10(c) which distinguishes between accidents causing "loss by separation," "loss of use," and "partial loss of use."
>
> Thus, the language of I.C. 22–3–3–13(a) clearly and unambiguously refers to those workers who no longer possess

a certain body part, or to those who no longer possess the use of a certain body part. Had the legislature intended the Second Injury Fund to benefit those who retain partial use of a body part, it could easily have so specified.

*Id.* at 1179–80.

Banks had 20/200 vision in her left eye before her work accident. Munster argues this is a total loss of use, such that the Second Injury Fund is triggered. In support, Munster cites Robert A. Fanning, *Worker's Compensation Handbook: A Comprehensive Guide to Worker's Compensation in Indiana* 40 (Indiana Chamber of Commerce 5th ed.2006), which states the Worker's Compensation Board has adopted a schedule of impairment based on the Snellen Test. Appendix F of the *Handbook* (reproduced at page 62 of the Appellant's Appendix) is a chart that equates levels of visual acuity to percentages of impairment. According to the chart, 20/200 acuity is a 100% impairment.

The *Handbook* does not cite any authority to demonstrate the Worker's Compensation Board has adopted the schedule set out in the *Handbook*.[3] Nor does Munster cite any such authority. Banks represents she conducted an exhaustive search for authority on that point and found none.

Munster included the chart with its brief to the Worker's Compensation Board, but the Board found: "a reading of 20/200 in her left eye is still a measurable reading of partial sight and thus fails to conform to the *Linville* requirement of a total rather than a partial loss of use." (Appellant's App. at 49.) It is not clear whether the Board was rejecting the chart entirely, or merely found it inconsistent with *Linville*

---

3. The "Guide to Indiana Worker's Compensation," which is available on the Board's website, does refer to the *Handbook* as "especially useful to Indiana employers," but does not explicitly adopt any of the *Handbook's* content. *See* http://www.in.gov/web/2333.htm (last visited Aug. 10, 2009).

in this case. Although this would be a reasonable interpretation of *Linville,* a closer analysis of *Linville* 's reasoning and the purpose of the Second Injury Fund leads us to the conclusion that access to the Fund is not necessarily foreclosed by *any* "measurable reading of partial sight."

Both the *Linville* majority and dissent looked to the compensation schedule in Ind.Code § 22–3–3–10 for support for their positions. This section assigns degrees of impairment to different types of injuries. In the case of vision, Ind.Code § 22–3–3–10(i)(5) assigns thirty-five degrees of impairment to "permanent and complete loss of vision by enucleation." Ind.Code § 22–3–3–10(i)(6) also assigns thirty-five degrees of impairment to "reduction of vision to one-tenth (1/10) of normal vision with glasses." Thus, the statutory scheme treats low-level vision the same as total loss of vision.

Allowing access to the Second Injury Fund when a person has limited vision is consistent with the purpose of the Fund. The Worker's Compensation Board describes the Fund as follows:

> The Second Injury Fund created by Ind. Code § 22–3–3–13 is designed to prevent discrimination in hiring workers who have lost or lost the use of an arm, hand, leg, or foot. When an employee loses the use of any two of these parts of the body, the employee is considered totally impaired, because a loss of any two of these parts is compensated by an award of 100 degrees of impairment pursuant to Ind.Code § 22–3–3–10(c)(2). Such injuries must be compensated by an award of 100 degrees of impairment or Permanent Total Disability (PTD), whichever is greater. Obviously, employers would hesitate to hire any employee who had already lost or lost the use of an arm, hand, foot, or leg, for fear that a second injury would expose them to liability for an award of PTD. Under § 22–3–3–13(a), the employer is held liable only to the extent of compensation due for the second injury. The Second Injury Fund is liable for the remainder of the compensation award.

Guide to Worker's Compensation in Indiana, *available at* http://www.in.gov/wcb/2333.htm (last visited Aug. 10, 2009); *see also Mayes v. Second Injury Fund,* 888 N.E.2d 773, 775 (Ind.2008) (quoting from the *Handbook* concerning the purpose of the Second Injury Fund). Because the Worker's Compensation Act treats low vision and total blindness the same, they pose the same concerns for employers. *See also Manous v. Manousogianakis,* 824 N.E.2d 756, 764 (Ind.Ct.App.2005) (Act to be construed to effectuate its humanitarian purpose).

Therefore, in harmony with the overall statutory scheme, we hold a qualifying loss of vision for purposes of the Second Injury Fund is one tenth of normal vision or less. According to the chart offered by Munster, 20/200 vision equates to a reduction of normal vision to one tenth. However, because it is unclear whether the Board accepts this chart, we remand for further consideration.

Banks argues that even if she had a qualifying loss of use of her left eye, she did not have a qualifying loss of use of her right eye, because Dr. Kaufman found her right eye could have acuity of up to 20/100. However, Dr. Kaufman also found it could be as poor as 20/200. In addition, Banks agrees that she is "legally blind" because of the reduction of her field of vision.[4]

---

4. The Board's decision notes Dr. Kaufman defined legal blindness as "visual acuity of 20/200 or less in *the better eye."* (Appellant's App. at 46) (emphasis by Board). The Board also looked up the term in the Merriam-Webster Online Medical Dictionary, where it

The Board stated it was "hard pressed to conclude that legal blindness for which there is no further correction or treatment is anything other than a permanent, total disability." (Appellant's App. at 51.) Given our holding today that absolute blindness is not required, we conclude that the Second Injury Fund may be triggered here, where the injury results in vision that meets the widely recognized definition of legal blindness and a total, permanent impairment.

### 2. *Banks' Cross-Appeal*

 On cross-appeal, Banks asks us to increase her award by ten percent because Munster's appeal is frivolous. *See* Ind. Code § 22–3–4–8(f) (award of full Board affirmed on appeal shall be increased by 5% and may be increased by 10%). As we have concluded further review of Munster's argument is warranted, we decline to increase Banks' award.

## CONCLUSION

Banks' cross-appeal is denied. The case is remanded for determination of whether Banks' vision in her left eye before the work accident was one tenth or less of normal vision.

Reversed and remanded.

BAKER, C.J., and BARNES, J., concur.

is defined as "blindness as recognized by law which in most states of the United States means that the better eye using the best possible methods of correction has visual acuity of 20/200 or worse or that the visual field is restricted to 20 degrees or less." http://www.merriam-webster.com/medical/legalblindness

(last visited Aug. 12, 2009). "Legal blindness" is a threshold of vision to qualify as "blindness" for purposes of certain public programs. *See, e.g.,* Ind.Code § 12–7–2–21 (defining "blind" for various public assistance programs, such as Medicaid).